DECISION
{¶ 1} AK Steel Corporation ("AK Steel") filed this action in mandamus, seeking a writ to compel the Industrial Commission of Ohio ("commission") to vacate its order granting Cheryl Davis an award for a violation of a specific safety requirement ("VSSR"). *Page 2 
 {¶ 2} In accord with Loc. R. 12, the case was referred to a magistrate to conduct appropriate proceedings. The parties stipulated the pertinent evidence and filed briefs. The magistrate then issued a magistrate's decision (attached as Appendix A) which contains detailed findings of fact and conclusions of law. The magistrate's decision includes a recommendation that we grant AK Steel its requested relief.
 {¶ 3} Cheryl Davis was injured when her right hand was drawn into a temper mill while the mill was running. The rolls of steel being fed through the temper mill were not guarded when being fed. The key issue in the granting or denying of a VSSR in this case is whether or not the temper mill rolls are feed rolls.
 {¶ 4} Bulletin 203 applies and defines feed rolls as rolls "which perform no other function than to feed material to the point of operation." Bulletin 203 has been construed and expanded in State exrel. Harris v. Indus. Comm. (1984), 12 Ohio St.3d 152, to include in the definition of feed rolls, rolls which perform a dual function or a secondary function.
 {¶ 5} Counsel for Cheryl Davis asserts that the temper roll mills in which Cheryl was injured performs a dual function similar to that in theHarris case and therefore constituted feed rolls. The rolls both feed the steel and temper the steel.
 {¶ 6} The magistrate viewed the temper rolls as not clearly being within the definition of feed rolls, so applied the rule of strict construction to the VSSR application. Under the magistrate's reasoning, if AK Steel was not clearly apprised that the temper rolls were feed rolls, then strict construction would protect AK Steel from a finding of a VSSR. *Page 3 
 {¶ 7} Counsel for Cheryl Davis sets forth three specific objections to the magistrate's decision:
 1. The Magistrate erred in concluding that "some evidence" did not exist upon which the Industrial Commission could base its finding that the temper mill rolls feed strip steel through the temper mill;
 2. The Magistrate erred in concluding that the Industrial Commission violated the rule of strict construction by finding that the temper mill rolls are feed rolls; and,
 3. The Magistrate erred in concluding that the specific safety rule at issue did not plainly apprise relator that its temper mill rolls would be viewed as feed rolls.
 {¶ 8} In the memorandum in support of the objections, counsel for Cheryl Davis points out that rolls of steel of up to 6,000 pounds are fed via the rollers in the temper mill. Obviously, no operator or helper caused 6,000 pounds of steel to move without some mechanical device providing the force to actually move the steel. Under theHarris case, the fact that the temper mill tempers the steel at the same time it moves the steel, does not change the basic function of moving the steel.
 {¶ 9} AK Steel in response argues that the rolls are not feed rolls because the primary purpose is to temper the steel, not move it. The commission, in granting the VSSR, did not view the facts this way and some evidence supports the commission's factual finding.
 {¶ 10} AK Steel also argues that the Supreme Court of Ohio did not expand the definition of "feed rolls" when it decided theHarris case. This argument also is not persuasive. The Supreme Court of Ohio clearly allowed feed rolls to perform multiple *Page 4 
functions despite Bulletin 203's express limitation that feed rolls perform no other function than to feed material to the point of operation.
 {¶ 11} We are compelled to follow the rulings of the Supreme Court of Ohio. We are also compelled to defer to the commission's interpretation of its own rules and regulations. We, therefore, must defer to the commission's interpretation of what constitutes a feed roll, an interpretation which seems to be consistent with the ruling inHarris.
 {¶ 12} As a result, we sustain the first and second objections to the magistrate's decision.
 {¶ 13} We sustain the third objection with the additional comment that an employer which is operating a roll which feeds 6,000 pounds of steel with no trace of guarding is on notice that the roll could be viewed as a feed roll.
 {¶ 14} We sustain the objections to the magistrate's decision. We adopt the findings of fact in the magistrate's decision, but not the conclusions of law except as referenced above. We, therefore, find some evidence supported the commission's order finding a VSSR. As a result, we deny the requested writ.
Objections sustained; writ denied.
 BRYANT, J., and McGRATH, P.J., concur. *Page 5 
 (APPENDIX A) IN MANDAMUS {¶ 15} In this original action, relator, AK Steel Corporation, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order granting the application of respondent Cheryl Davis ("claimant") for an additional *Page 6 
award for violation of a specific safety requirement ("VSSR"), and to enter an order denying the application.
Findings of Fact: {¶ 16} 1. On November 13, 2002, claimant sustained a severe injury to her right hand when it was pulled into the rolls of a temper mill.
 {¶ 17} 2. On November 10, 2003, claimant filed an application for a VSSR award.
 {¶ 18} 3. The VSSR application prompted the Safety Violations Investigation Unit ("SVIU") of the Ohio Bureau of Workers' Compensation to conduct an investigation.
 {¶ 19} 4. On March 30, 2004, the SVIU investigator issued a report.
 {¶ 20} 5. According to the SVIU report, the temper mill was put into use in 1966.
 {¶ 21} 6. Claimant's affidavit executed January 14, 2004 is an exhibit to the SVIU report. Claimant's affidavit states:
 * * AK Steel Corporation ("AK Steel") hired me on October 31, 1994 as a laborer. At the time of my injury, I was employed as an operator, but I was bumped to a helper due to the closing of a mill. My general job duties as a helper included, but were not limited to: mounting the coil, put paper up, and feed the steel through the mill.
 * * On the date of my injury, I was working as a helper on an eighteen (18) inch Temper Mill. The operator of this mill was Scott McKee. As I was wiping a spot from the work rolls, my right hand was pulled into the rolls. * * * Scott was standing next to me and he hit the emergency stop. * * *
 * * I was not aware that the mill was on when I went to wipe the spot. Immediately prior to my injury, Scott stated that there was a "goober" on the rolls that needed removed. This spot had to be removed or the spot would have transferred to the steel. When I was an operator, I would not have had the machine on until we had the steel fed through the mill. My injury happened as Scott and I were setting up the mill for our shift. *Page 7 
 * * * I did not know Scott had turned the mill on when the steel was not fed through the mill. I was trained to keep the power off on the mill until the steel was fed through. Each operator seems to have their own way of setting up the machines in the facility.
 * * * The temper mill is used to temper the steel from the coil.
 {¶ 22} 7. The affidavit of Scott McKee executed February 5, 2004 is also an exhibit to the SVIU report. The McKee affidavit states:
 * * On the date of Cheryl Davis' injury, I was working as a machine operator and Cheryl was my helper. Prior to Cheryl's injury, she had been employed as an operator for z-mill, but was bumped to a helper when that mill closed. The day prior, I put two (2) new rolls onto the machine. I had started the mill at the beginning of the shift to check to see if there was any type of residue on the rolls. There are hunter wipes on the recoil side of [the] temper mill. These wipes continuously move back and forth on the rolls to keep them clean. The wipes are not turned on until the rolls are up to speed. After I turned on the rolls, I noticed a spot on the bottom roll. I stated that there was something on the bottom roll. I did not instruct or request Cheryl to do anything. Cheryl started to go around the machine to the payoff side. I was a step behind her. The next thing that happened was Cheryl's arm jerk[ed] into the machine. Immediately, I hit the emergency stop on the payoff side of the temper mill.
 * * Although the mill was running when Cheryl was injured, it would be very hard to tell the mill was running when the rolls are new. New rolls have a mirror-like image and the temper mill does not make any type of noise when it is running. I do not believe Cheryl realized the temper mill was running.
 * * Each operator has a different practice of starting up the mill. Some operators may check for spots or residue a different way than how I started up my temper mill. The only standard practice for the mill's operation that I am aware of is the feeding of the strip into the mill. *Page 8 
 {¶ 23} 8. On January 18, 2007, the VSSR application was heard by a staff hearing officer ("SHO"). The hearing was recorded and transcribed for the record.
 {¶ 24} 9. During her direct examination, claimant testified:
 [Claimant's counsel:] So let's talk about the date of injury, which was November 13, 2002. What time did you report to work?
 [Claimant:] 6:45.
 [Claimant's counsel:] Okay. Was that your normal time?
 [Claimant:] Yes. Before 7:00.
 [Claimant's counsel:] Okay. What was your assignment for that day?
 [Claimant:] I was a helper on the temper mill.
 [Claimant's counsel:] Okay. So you ran the temper mill this day but not the Z mill.
 [Claimant:] Yes.
 [Claimant's counsel:] Okay. Why the change?
 [Claimant:] They shut down the Z mill.
 [Claimant's counsel:] Okay. And had you been working on the temper mill for a long period of time?
 [Claimant:] No. Three days.
 [Claimant's counsel:] Okay. Were you working with someone else?
 [Claimant:] Yes. With Scott McKee. Yes.
 [Claimant's counsel:] Had you ever worked with Scott McKee before?
 [Claimant:] Occasionally. *Page 9 
 * * *
 [Claimant's counsel:] * * * Why was it necessary to clean the rolls?
 [Claimant:] When the rolls would come to us, they would have — — I don't know what it was called — — stuff on them to coat a coating on it. And we had to use kerosene and water and then the window cleaner to get all that off.
 [Claimant's counsel:] I see. And did you ever have to clean them besides that?
 [Claimant:] If the mark wouldn't be on the roll, we would clean it.
 [Claimant's counsel:] What would happen if you didn't clean the roll and there was a mark?
 [Claimant:] It would transfer onto the steel.
 [Claimant's counsel:] And would the steel be used at that point or —
 [Claimant:] Well, it would depend on where the spot was, but no. Certainly, they didn't want that spot on their steel.
 [Claimant's counsel:] Okay. So in order to produce the product as required, you had to keep the rolls clean?
 [Claimant:] Yes.
 [Claimant's counsel:] Okay. Let's go back to the date of injury. You were working with Scott McKee. And just tell us what you did when you arrived.
 [Claimant:] I came in, and I started up all the electrical power to the mill so I could perform my job to put the coil on and get it ready to feed through the mill.
 [Claimant's counsel:] And when you feed it through, describe that, please. *Page 10 
 [Claimant:] You draw the strip up, and you put paper — you put tape on the end of the strip and then paper and cardboard. And you would jog it up and feed it up with your hand.
 [Claimant's counsel:] How close would you get to the rolls?
 [Claimant:] Probably two or three inches.
 [Claimant's counsel:] Okay. And you would feed it through. And then the other person would do what?
 [Claimant:] They would grab it and pull it out of the rolls —
 [Claimant's counsel:] And how close —
 [Claimant:] — and guide it out.
 [Claimant's counsel:] How close would they get to the rolls?
 [Claimant:] Probably a half an inch.
 [Claimant's counsel:] Okay. So you reported, you turned on the electrical equipment, then what did you do?
 [Claimant:] I got the coil ready to go. And I was back there putting the tape on. And when Scott — I turned around and got a cup of coffee, and then I started to walk back around. And I met Scott. And he said, I have a goober on my bottom roll.
 [Claimant's counsel:] Now, a goober, is that — what did that mean to you?
 [Claimant:] That meant there was a spot on the bottom roll.
 [Claimant's counsel:] Okay. And if there was a spot on the roll, you earlier said that it had to be removed?
 [Claimant:] Yes.
 [Claimant's counsel:] Okay. So you see Mr. McKee. He said there's a goober on the bottom roll. Then what? *Page 11 
 [Claimant:] I picked up the Windex and a rag. I sprayed the rag and reached in to wipe it off.
 [Claimant's counsel:] Okay. Now, from the time you saw Mr. McKee and he said that and the time you reached in to wipe it off, how long passed? Minutes? Seconds?
 [Claimant:] Seconds.
 [Claimant's counsel:] So was this more of one motion as far as you heard his statement, you turned, or was there —
 [Claimant:] I took about three steps and picked up the rag and the Windex and reached in and wiped it off.
 [Claimant's counsel:] Now, you said you picked up a rag. Was a rag kept there?
 [Claimant:] Yes.
 [Claimant's counsel:] All the time?
 [Claimant:] All the time.
 [Claimant's counsel:] Okay. And that was what you would use to wipe down the rolls?
 [Claimant:] Yes.
 [Claimant's counsel:] And how about the bottle of Windex?
 [Claimant:] It was kept there.
 [Claimant's counsel:] Okay. So Mr. McKee stated there's a goober. You took a couple of steps, picked up the rag, turned, and reached your hand in?
 [Claimant:] Yes.
 [Claimant's counsel:] What happened?
 [Claimant:] It jerked my hand in. The rag pulled my hand in. And Scott hit the E-Stop.
 [Claimant's counsel:] Okay. *Page 12 
 [Claimant:] But I'm not sure if I jerked out or he hit the E-Stop first.
 [Claimant's counsel:] Now, previously, you stated that you were aware that you weren't supposed to touch moving rolls?
 [Claimant:] Yes.
 [Claimant's counsel:] So why did you reach your hand in there?
 [Claimant:] I didn't know he started it. When I operated, I never started the mill until the coil was fed through.
 {¶ 25} 10. During the hearing, the following exchange occurred among the SHO, relator's counsel, and Mr. Jones, who testified on behalf of relator:
 HEARING OFFICER MILLER: Okay. And so what is this red part here? What is that?
 MR. JONES: That's a piece of Micarta.
 HEARING OFFICER MILLER: Like a table?
 MR. JONES: Like a table. It's a table you rest on when you slide it through.
 HEARING OFFICER MILLER: Now, how — approximately, how long is that?
 MR. JONES: The Micarta?
 HEARING OFFICER MILLER: Yeah. Until you get to those still to the mirror looking
 MR. JONES: We have that measurement. I don't know exact measurement. I'm guessing.
 MR. DIMLING: Here you go.
 MR. JONES: There it is. Okay. Picture 8, 43 inches. *Page 13 
 HEARING OFFICER MILLER: Forty three inches?
 {¶ 26} 11. During the hearing, relator's counsel argued:
 * * * The potentially applicable section as we've talked about today under Section 11, which deals first with the concept of power-driven feed rolls — first of all, these are not feed rolls. They're work rolls. They perform the point of operation function of the temper mill. They do not feed the material to other locations. * * *
 {¶ 27} 12. Following the January 18, 2007 hearing, the SHO issued an order granting the VSSR award. The SHO's order of January 18, 2007 explains:
 The Staff Hearing Officer will address a procedural issue before addressing the merits of the injured worker's application for Violation of a Specific Safety Regulation filed on 11/20/2003. In particular, the Staff Hearing Officer has to determine whether the Industrial Commission 5 Specific Safety Requirements of the Industrial Commission of Ohio Relating to all Workshops and Factories effective January 1, 1967 or whether Bulletin No. [203] State of Ohio Specific Requirements and General Safety Standards of the Industrial Commission of Ohio for Workshops and Factories, effective January 3, 1955, is the proper regulation to use in determining if the employer violated a safety regulation.
 A review of the evidence on file prior to hearing indicated that the machinery on which the injured worker sustained her injury was placed into service July 1966. At hearing, the Staff Hearing Officer questioned the employer's counsel if the machinery had been moved or altered in any fashion. The employer's counsel testified that the machine had not been modified since it was placed in service.
 It is the order of the Staff Hearing Officer that the Safety Regulation that governs the application for Violation of Specific Safety Regulation is Bulletin 2[0]3. The Staff Hearing Officer relies on the fact that the evidence establishes that the machinery has not been moved or altered in any fashion since placed in service. Therefore, the Regulation in effect at the time the machinery was placed in service is the Regulation that governs. The record reveals that the injured worker on her application did not cite Bulletin *Page 14 
203 or Industrial Commission -5. The injured worker listed O.A.C. 4121:1-5-05(H); 4121:1-5-11(D)(10)(a); 4121:1-5-11(E). The Staff Hearing Officer notes that injured worker cited OAC 4121 which in reality the Safety Regulation starts with 4123.
 The Staff Hearing Officer finds that the application can still go forward, however, the injured worker will have to refer to regulations in effect at the time the machinery was placed in service. The Staff Hearing Officer finds employer was placed of notice that the injured worker has filed an application and the regulations that injured worker has cited in Bulletin 203 does not place the employer at a disadvantage. In fact Bulletin 203 does not even contain certain regulations cited by the injured worker on her application. The injured worker's counsel's [sic], after reviewing Bulletin 203, stated that the injured worker is alleging that the employer violated the regulations listed in Section 2: Feed Rolls power driven.
 It is the finding of the Staff Hearing Officer that the injured worker was employed on the date of injury noted above, by the employer as a operator/helper, and the injured worker sustained an injury in the course of and arising out of her employment when she reached into the temper mill to wipe off a spot. The claim was allowed for amputation right second finger, amputation of the tip right third finger, right fourth finger and right fifth finger.
 A review of the record establishes that in 1994 the employer hired injured worker as a laborer at the steel mill. In addition, the injured worker received on the job training and became a mill operator and helper. The injured worker testified that she operated the two types [of] mills — the Z and temper mills, that on the day of the injury she was working as a helper on the temper mill due to cutbacks of staff. The record reflects that the injured worker attended training for safe operation of the Z and temper mill. She indicated that the Z and temper mill worked the same. The coil of steel is fed between two rollers in the mill. With respect to the Z mill, the rollers were enclosed and with [a] temper mill the rollers were not enclosed, that a person could see the rollers.
 The injured worker testified it is procedure for the operator to set up the temper mill and to clean the mill. The injured worker testified that when the mill was not running, the *Page 15 
operator would wipe down the rolls if there were something on the rollers. The operator would place the machine in polish mode and use a squeegee to wipe off the rolls. When the rolls were in polish mode, the rolls would roll outward instead of inward. On the day of the injury, the injured worker testified that the operator, Mr. McKee, stated a goober/spot was on the temper roll, that she picked up a rage [sic] to wipe the goober off the roll. When she reached into the mill with [the] rag, the rollers pulled her hand into the mill. Mr. McKee hit the emergency stop button. The injured worker testified that she did not know the mill was running, she thought it was off. She attempted to clean the goober off the rollers because she was thinking as an operator and not a helper.
 The injured worker stated that the employer violated Bulletin No 2[0]3 Chapter 2, Section 11, which states "power — driven feed rolls, when exposed to contact, shall be guarded when practical so as to prevent the hands of the operator from coming into contact with the in running rolls at any point. An effective safeguard shall be used to prevent kick-backs."
 After reviewing all the testimony, evidence on file and pictures of the roller temper mill, it is the finding of the Staff Hearing Officer that the employer did not adhere to the regulation that the injured worker cited.
 There is no question that the rollers on the temper mill are exposed to contact. The rollers could have been guarded when practical to prevent the operator from coming into contact with in running rolls at any time. After the accident, the employer placed for want of a better word a table in front of the temper rolls. This table prevents hands of the operator from coming into contact with in running rolls at any time.
 The Staff Hearing Officer finds if the employer had guarded the temper rolls the injured worker would not have been able to come in contact with the in running rolls. The Staff Hearing Officer finds that the lack of the guard was the proximate cause of the injured worker's accident.
 {¶ 28} 13. Relator moved for rehearing pursuant to Ohio Adm. Code 121-3-20(C). *Page 16 
 {¶ 29} 14. On July 14, 2007, another SHO mailed an order denying relator's motion for rehearing.
 {¶ 30} 15. The record contains the affidavit of Barry White executed April 22, 2005. Barry White is the president of Barry White Associates, which provides consulting services to employers regarding workplace safety. Apparently, the White affidavit was executed on relator's behalf. The affidavit states:
 * * On May 27, 2003, I inspected and observed the operation of the 18" Temper Mill at AK Steel's Coshocton Works.
 * * The machine is a Waterbury Farrel-2 HI 20" by 24" Temper Mill .003"/.045" Gauge-16" I.D./44" O.D. 6000 lb. Capacity, 350 Hp Mill Drive, 100 Hp Tension Reel Drive, 2 x 7.5 Hp Screwdown Drive. Coils of between 8 inches to 20 inches wide of stainless steel are fed into the Temper Mill. The stainless steel is rolled between 2 highly polished work rolls to enhance the color of the steel, improve flatness, and remove strain.
 * * The opening on the feed side of the Temper Mill is 32" wide and 38-1/2" high. The top edge of the machine over which the steel is moved while being fed into the machine for processing is 42-1/2" from the floor. The nip point of the work rolls is 46" from the outer edge of feed side of the machine's frame.
 {¶ 31} 16. The record contains a March 23, 2005 report from mechanical engineer Richard E. Harkness, Ph.D., P.E., who inspected the temper mill on June 11, 2004. Harkness reported to claimant's counsel:
 The mill consists of two horizontal counter-rotating steel rolls placed directly above each other. The mill was designed and manufactured by Waterbury Farrel Foundry and Machine Co. The mill is driven by a 350 h.p. direct current electric motor capable of driving the rolls at a linear speed of 250 to 500 feet per minute. The payoff reel is a collapsible mandrel type having a 24 inch face and is mounted on an entry coil *Page 17 
buggy. The recoil, or tension, reel rewinds the strip into a coil having an internal diameter of 16 inches and an outside diameter of 44 inches. A coil having a maximum weight of 6,000 pounds can be handled by the system.
 The operator's station is on the recoil side of the machine and the helper's station is on the payoff side. The operator's station has a large control panel with controls for line speed, tension, roll wipes, mandrel expand/collapse, mill jog forward/reverse, roll polisher, paper winder start/stop and emergency stop. The helper has two small control panels, one for the screw down mechanisms and one having jog, brake, payoff traverse and emergency stop controls.
 {¶ 32} 17. The record also contains an affidavit executed by Harkness on May 7, 2005. The Harkness affidavit states:
 * * * The incident occurred on the eighteen inch temper mill of AK Steel, Coshocton Stainless Works (AK Steel). This unit consists of two unguarded counter-rotating work rolls which receive coil stock from a payoff reel, pulls it in and rolls it to improve the hardness and surface finish. After going through the work rolls the stock is rewound on the recoiler. Oscillating wipes on the recoil side are used to keep the rolls clean during production. The operator's station is on the recoil side and the helper's station is on the payoff, or entry, side. To clean the rolls before a production run, the operator turns a switch on the control panel to the "polish mode" position. This reverses the direction of the rolls such that the payoff side of the mill is now an out-running nip point. The rolls can then be cleaned from this side without danger of injury.
 {¶ 33} 18. On August 24, 2007, relator, AK Steel Corporation, filed this mandamus action.
Conclusions of Law: {¶ 34} It is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below. *Page 18 
 {¶ 35} Preliminarily, the magistrate finds that the commission, through its SHO, incorrectly determined that the applicable safety rule at issue is found at Bulletin No. 203 effective January 3, 1955. In that bulletin, under "Specific Requirements and General Safety Standards of the Industrial Commission of Ohio for Workshops and Factories," the following safety rule is found:
 Section 11. Feed Rolls.
 Power-driven feed rolls, when exposed to contact, shall be guarded when practical so as to prevent the hands of the operator from coming into contact with the in-running rolls at any point. * * *
 {¶ 36} The magistrate finds that the applicable safety rule at issue is found at Bulletin No. 203 effective April 1, 1964. In that bulletin, under "Specific Safety Requirements of the Industrial Commission of Ohio Relating to all Workshops and Factories," the following safety rule is found:
 207 FEED ROLLS
 Power-driven feed rolls, when exposed to contact, shall be guarded so as to prevent the hands of the operator from coming into contact with the in-running rolls at any point.
 {¶ 37} It can be noted that Bulletin No. 203 effective April 1, 1964 announced that the safety requirements supersede Bulletin No. 203 effective January 3, 1955.
 {¶ 38} The magistrate further notes that effective January 1, 1967, the commission issued manual IC-5 containing specific safety requirements relating to all workshops and factories. The IC-5 manual replaced Bulletin No. 203 relating to all workshops and factories. The IC-5 manual provides:
 IC-5-03.10 FEED ROLLS *Page 19 
 Power-driven feed rolls, when exposed to contact, shall be guarded so as to prevent the hands of the operator from coming into contact with the in-running rolls at any point.
 {¶ 39} On the date of injury, November 13, 2002, former Ohio Adm. Code 121:1-5 provided specific safety requirements for all workshops and factories. Former Ohio Adm. Code 4121:1-5-01(A) captioned "Scope," stated in part:
 Installations or constructions built or contracted for prior to the effective date (shown at the end of each rule) of any requirement shall be deemed to comply with the provisions of these requirements if such installations or constructions comply either with the provisions of these requirements or with the provisions of any applicable specific requirement which was in effect at the time contracted for or built.
 {¶ 40} On the date of injury, former Ohio Adm. Code 4121:1-5-05
captioned "Auxiliary equipment," contained the following safety rule:
 (H) Feed rolls.
 Power-driven feed rolls, when exposed to contact, shall be guarded so as to prevent the hands of the operator from coming into contact with in-running rolls at any point.
 {¶ 41} In her VSSR application, claimant alleged that her industrial injury was proximately caused by relator's violation of former Ohio Adm. Code 4121:1-5-05(H) relating to feed rolls.
 {¶ 42} In his order of January 18, 2007, the SHO determined that the applicable safety rule is determined by the date the temper mill was placed into service. Finding that the temper mill had been placed into service in July 1966 and had not since been modified, the SHO concluded that Bulletin No. 203 effective January 3, 1955 contained the applicable safety rule. *Page 20 
 {¶ 43} Apparently, the SHO was unaware that Bulletin No. 203 effective January 3, 1955 had been superseded by Bulletin No. 203 effective April 1, 1964, a date prior to the July 1966 date of placement into service.
 {¶ 44} Significantly, the 1964 version of Bulletin No. 203 deletes the words "when practical" from the safety rule regarding feed rolls.
 {¶ 45} In State ex rel. Arce v. Indus. Comm., 105 Ohio St.3d 90,2005-Ohio-572, the court construed Ohio Adm. Code 4123:1-5-01(A) (the grandfather clause) which is former Ohio Adm. Code 4121:1-5-01(A). InArce, the court held that under the grandfather clause governing workshops and factories, the only time that date of injury does not control applicability is when the injurious device is an installation or construction.
 {¶ 46} Here, no one has claimed that the temper mill is not an installation or construction. Thus, the grandfather clause in effect on the date of injury applies so that relator may satisfy the safety rule by complying with any applicable specific requirement in effect at the time the temper mill was contracted for or built.
 {¶ 47} Presumably, the temper mill at issue was placed into service (July 1966) on or about the time it was contracted for or built. Accordingly, the specific safety rule in effect in July 1966 controls this VSSR action.
 {¶ 48} Given the above analysis, this magistrate concludes that the SHO's order of January 18, 2007 incorrectly determined that Bulletin No. 203 effective January 3, 1955 was applicable when, as shown above, Bulletin No. 203 effective April 1, 1964 is applicable. *Page 21 
 {¶ 49} The main issue here is whether the temper mill contains feed rolls as defined by the applicable specific safety rule.
 {¶ 50} As previously noted, Bulletin No. 203 effective April 1, 1964 provides specific safety requirements relating to all workshops and factories. Part 2 of those specific safety requirements is captioned "Power Transmission Machinery." Thereunder, it is stated:
 Part 2 applies to power-transmission machinery and facilities required to transmit power to operating equipment or machine tools. Part 2 shall not be construed as being applicable to power transmission facilities located within the frame of the equipment and exposure is necessary to its operation or adjustment.
 {¶ 51} Thereunder is found the following specific safety requirement:
 207 FEED ROLLS
 Power-driven feed rolls, when exposed to contact, shall be guarded so as to prevent the hands of the operator from coming into contact with the in-running rolls at any point.
 {¶ 52} Bulletin No. 203 effective April 1, 1964 provides definitions applicable to the safety rules relating to all workshops and factories. These definitions are found under Section 2:
 2.5 Exposed to contact means that the location of the material or object, during the course of operation, is accessible to the employee in performance of his regular or assigned duty.
 * * *
 2.8 Feed rolls means rolls which perform no other function than to feed material to the point of operation.
 * * * *Page 22 
 2.10 Guarded means that the object is covered, fenced, railed, enclosed or otherwise shielded from accidental contact.
 * * *
 2.16 Point of Operation means the point or points at which material is placed in or removed from the machine.
 {¶ 53} According to relator, the temper mill rolls are not feed rolls within the definition set forth in Bulletin No. 203. The rolls do not advance the steel to any other area in the mill where work is being performed. According to relator, the rolls are the mill's sole point of operation, and it is the helper and operator (and not any feed rolls) that feed the strips of steel into the point of operation.
 {¶ 54} Relator points out that the temper mill rolls perform the function of tempering the steel "to improve its flatness, strength and appearance." (Relator's brief, at 5.) Parenthetically, the magistrate notes that Barry White stated that the rolls served to "enhance the color of the steel, improve flatness, and remove strain." Richard Harkness states that the rolls serve "to improve the hardness and surface finish." Thus, according to relator, it cannot be said that the rolls perform no other function than to feed material to the point of operation.
 {¶ 55} On the other hand, claimant cites and discusses State ex rel.Harris v. Indus. Comm. (1984), 12 Ohio St.3d 152, for the proposition that feed rolls can serve a secondary function other than feeding material to the point of operation.
 {¶ 56} In Harris, Robert Harris was cleaning an offset printing press when his right hand and arm were drawn into the ink rollers. The press was kept running during the cleaning process. After the commission denied his VSSR application, Harris filed an *Page 23 
original action in this court. This court denied the writ, but on appeal to the Supreme Court of Ohio this court's decision was reversed.
 {¶ 57} In Harris, the controversy centered upon whether the ink rolls were feed rolls. The specific safety rule at issue in Harris read the same as the rule at issue here even though the rule in Harris was found in the Ohio Administrative Code rather than Bulletin No. 203.
 {¶ 58} In Harris, as noted by the majority, the appellant (employer) argued:
 * * [T]he ink rolls in question are not feed rolls because they perform functions beyond that specified in the definitions, i.e., they move the ink well beyond the point of entry, deep into the machine, to a point one step removed from the actual printing process. Appellees also point to the fact that the ink rolls cause the ink, so moving, to be spread across the rolls for even application in the printing process. This, they contend, illustrates a secondary function which * * feed rolls cannot perform.
 Appellant submits that the clear facts of the case illustrate that the ink rolls are, in fact, feed rolls. We agree. Ohio Adm. Code 121:1-5-10(B)(43) defines the "point of operation" as "the area of the press where material is actually positioned and work is being performed during any process, * * *." This definition, although referring particularly to me chanical power presses, provides a more sensible approach to the problem presented by the facts of the instant appeal. The ink rolls in question clearly feed material to the area of the press where work is being performed during the printing process.
 The commission has the discretion to interpret its own rules; however, where the application of those rules to a unique factual situation gives rise to a patently illogical result, common sense should prevail. Appellant's contention that Ohio Adm. Code 4121:1-5-05(H) was violated is well-supported by the facts. The commission abused its discretion in determining otherwise.
Id. at 153. *Page 24 
 {¶ 59} In Harris, Justice Holmes dissented, stating:
 [The rule] defines "feed rolls" as those "rolls which perform no other function than to feed material to the point of operation." The ink rolls on appellee's printing press do not satisfy this definition in two respects.
 First, the ink rolls clearly served more than one function. Their primary purpose was to spread and distribute ink used in the printing process in an even manner to prevent build-up or smearing.
 Second, the rolls do not advance or feed ink to the point of operation on the printing press. In fact, the rolls merely advance ink from a storage container to a metal plate roll which then transfers the ink to a middle cylinder encased with a rubber blanket. * * *
Id. at 155.
 {¶ 60} Here, claimant argues that the temper mill rolls perform the dual purpose of feeding the steel into the point of operation and tempering the steel. That is, the rolls create the point of operation and also feed the steel to the point of operation so created. According to claimant, to hold that the rolls are not feed rolls leads to the illogical premise that tempering can be performed without the material being fed into the mill. (Claimant's brief, at 8.) Thus, claimant argues that relator's position gives rise to a patently illogical result where commonsense should prevail.
 {¶ 61} The magistrate agrees with relator's position that the temper mill rolls are not feed rolls.
 {¶ 62} Two principles control. First, specific safety requirements must contain specific and definite requirements of a character that plainly apprises an employer of its legal obligation. State ex rel.Trydle v. Indus. Comm. (1972), 32 Ohio St.2d 257. Second, because an award for a VSSR is a penalty against the employer, all reasonable *Page 25 
doubts regarding the applicability of the requirement must be resolved in the employer's favor. State ex rel. Burton v. Indus. Comm. (1989),46 Ohio St.3d 170. The second principle is often called the rule of strict construction. See State ex rel. Carder v. Indus. Comm.,94 Ohio St.3d 165, 2002-Ohio-344.
 {¶ 63} In the magistrate's view, claimant's position effectively rewrites Bulletin No. 203's definition of feed rolls "which perform no other function than to feed material to the point of operation." Here, unlike the ink rolls in Harris, the temper mill rolls provide the point of operation. It could thus be argued that the primary function of the temper mill rolls is to provide the point of operation where the steel is being tempered.
 {¶ 64} Of course, the steel must be fed into the temper mill roll. Relator argues that the mill operator or helper actually feeds the steel into the temper mill rolls. Claimant argues, in effect, that, when the rolls accept the steel being fed, they perform a dual function of feeding the steel into the point of operation and actually providing the point of operation.
 {¶ 65} In Harris, the majority opinion can be read to say that secondary functions do not necessarily change the character of feed rolls as long as the rolls feed material to the point of operation. Here, it cannot be seriously contended that the point of operation created by the temper mill rolls is a secondary function.
 {¶ 66} In the magistrate's view, to permit the commission to hold that the temper mill rolls at issue are feed rolls violates the two principles applicable to VSSR applications. First, the specific safety rule at issue did not plainly apprise relator that its temper mill rolls would be viewed as feed rolls. Second, the commission's *Page 26 
determination that the temper mill rolls are feed rolls violates the rule of strict construction.
 {¶ 67} Accordingly, for all the above reasons, it is the magistrate's decision that this court issue a writ of mandamus ordering the commission to vacate its order granting the VSSR application and to enter an order denying the application. *Page 1